UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SALVATORE M. TALLUTO, Derivatively and On Behalf of BEST BUY CO, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD M. SCHULZE, LISA M. CAPUTO, BRIAN J. DUNN, KATHY J. HIGGINS VICTOR, RONALD JAMES, ELLIOT S. KAPLAN, SANJAY KHOSLA, GEORGE L. MIKAN III, MATTHEW H. PAULL, ROGELIO M. REBOLLEDO, HATIM A. TYABJI, GERARD VITTECOQ <br><br> Defendants, <br><br> -and- <br><br> BEST BUY CO., INC., a Minnesota corporation, <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Salvatore M. Talluto ("Plaintiff"), derivatively and on behalf of Nominal Defendant Best Buy Co, Inc. ("Best Buy" or the "Company"), and for his Verified Derivative Complaint against Defendants herein, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and under the direction of its attorneys, which investigation included a review of press releases and other public statements made by Best Buy, as well as its officers and agents, filings by the Nominal Defendant with the United States Securities and Exchange

Commission ("SEC"), and other publicly available articles and information about the Company and its management in the financial and general press on the Internet.

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought by Plaintiff for the benefit of Best Buy against Defendants, who are certain members of the Company's Board of Directors (the "Board"), and certain of its officers. This action seeks to recover for Best Buy and its shareholders the millions of dollars of damages caused by Director Defendants' intentional, reckless and/or negligent violations of federal and state law, including breaches of fiduciary and professional duties, statutory violations, acts of gross mismanagement, abuse of control, unjust enrichment and waste of corporate, as well as harm to the Company's reputation and other violations of law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would otherwise lack.

3.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District. One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

2

4.      This action arises out of a scheme and course of wrongful conduct whereby Defendants permitted and/or acquiesced to violations of state and federal securities laws resulting in current litigation pending in the district.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Best Buy conducts business in this District.

7.      Throughout this scheme and course of wrongful conduct, Defendants were aware of, acquiesced in and/or permitted this unlawful scheme.

8.      As a result of Director Defendants' misconduct, Best Buy has sustained millions of dollars in damages. Further the Company has damaged business relationships with investors which may never be restored.

## PARTIES

### Plaintiff.

9.      Plaintiff, Salvatore M. Talluto, resides in Gwinnett County, Georgia. Mr. Talluto held common shares of Best Buy during the relevant time period.

### Nominal Defendant.

10.      Nominal Defendant Best Buy is a Minnesota corporation with its principal executive offices located at 7601 Penn Avenue South, Richfield, Minnesota. Best Buy is a multinational retailer of consumer electronics, home office products, entertainment products, appliances and related services. It operates retail stores and call centers and conducts online retail operations under a variety of brand names such as Best Buy (BestBuy.com, BestBuy.ca,

3

BestBuy.co.uk), Best Buy Mobile (BestBuyMobile.com), The Carphone Warehouse (CarphoneWarehouse.com), Five Star (Five-Star.cn), Future Shop (FutureShop.ca), Geek Squad, Magnolia Audio Video, Napster (Napster.com), Pacific Sales and The Phone House (PhoneHouse.com).

## *Background on Best Buy*

### Director Defendants.

11.     The biographical information for each of the Director Defendants below has been taken from the Company's Proxy Statement dated May 11, 2010:

12.     Director Defendant Richard M. Schulze is a founder of Best Buy. He has been an officer and director from inception in 1966 and currently serves as the Chairman of the Board. Effective in June 2002, he relinquished the duties of CEO, having served as the principal executive officer for more than 30 years. He is on the board of trustees of the University of St. Thomas, chairman of its Executive and Institutional Advancement Committee, and a member of its Board Affairs Committee. Mr. Schulze is also chairman of the board of governors of the University of St. Thomas Business School and serves on the board of the Richard M. Schulze Family Foundation. He previously served on the board of Pentair, Inc., a diversified industrial manufacturing company, and The Best Buy Children's Foundation. Mr. Schulze holds an honorary doctorate of laws degree from the University of St. Thomas. As a founder of the company with over 40 years experience in the retail industry, and having built the company from a single store and three employees to a multi-national organization with over 4,000 locations and over 180,000 employees, he has an in-depth view of the business and branding. In addition, Mr. Schulze's deep knowledge of our culture and commitment to preserving the entrepreneurial environment provide continuity and long-term thinking to the Board.

13.     Director Defendant Lisa M. Caputo has been a director since December 2009. Ms. Caputo is executive vice president and chief marketing officer for Citigroup Inc., a leading global financial services company. Since January 2000, she has been founder, chairman and chief executive officer of Citi's Women & Co. business, a membership service that provides financial education and services for women. As such, she is a driving force for women in leadership, an area of focus for us. From 1998 to 1999, Ms. Caputo was vice president, global communications and synergy for Disney Publishing Worldwide, the world's largest publisher of children's books and magazines. From 1996 to 1998, she was vice president of corporate communications for CBS Corporation, a mass media company. From 1992 to 1996, Ms. Caputo served in President Bill Clinton's administration, both as press secretary for First Lady Hillary Rodham Clinton, and as deputy assistant to the President. Ms. Caputo also serves on the boards of WNET Channel 13, The Sesame Workshop, New Visions for Public Schools and The Creative Coalition. She is a member of the International Steering Committee for FINCA International, The New York Presbyterian Sloane Hospital Advisory Committee, the Women@NBCU Advisory Board, the Council on Foreign Relations and the Financial Women's Association. With her broad background with various for-profit companies and non-profit organizations, Ms. Caputo brings to the Board extensive marketing expertise, global and corporate communications experience and political savvy. She is also a highly respected, well-connected leader and is credited for her comprehensive approach, intelligence and tenacity.

14.     Director Defendant Brian J. Dunn has been a director since June 2009 when he was also named the CEO. A 25-year veteran of our company, Mr. Dunn began his career with us as a store associate in 1985 when we operated only a dozen stores. From February 2006 until being named to his current position, Mr. Dunn served as President and Chief Operating Officer.

5

Prior to that, he held numerous positions within our company, including President — Retail, North America, Executive Vice President, Senior Vice President, Regional Vice President, Regional Manager, District Manager and Store Manager. During his time with us, Mr. Dunn has made significant contributions to our market share growth, employee retention, vendor relationships and customer satisfaction scores. Mr. Dunn also serves on the board of Dick's Sporting Goods, Inc., a full-line sporting goods retailer, as well as on the board of The Best Buy Children's Foundation. Mr. Dunn plans to complete his term on the board of Dick's Sporting Goods, Inc., but will not stand for re-election at their June 2010 meeting. Mr. Dunn has established himself as a powerful representative of our brand, an advocate for our unique culture, and a decisive architect of organizational transformation. His personal involvement in the site selection and opening process of over five hundred stores provides him with valuable commercial real estate experience. In addition, Mr. Dunn's day-to-day leadership provides him with intimate knowledge of our operations. His reputation as a leader and success in retail, branding and market expansion are valuable assets to the Board as it looks to move forward in an ever-changing retail environment.

15. Director Defendant Kathy J. Higgins Victor has been a director since November 1999. Since 1994, she has been president of Centera Corporation, an executive development and leadership coaching firm that she founded, located in Minneapolis, Minnesota. From 1991 to 1994, she was senior vice president of human resources at Northwest Airlines, Inc. (now Delta Air Lines), a commercial airline, and prior to that held senior executive positions at The Pillsbury Company (subsequently acquired by General Mills, Inc.), a producer of grain and other foodstuffs, and Burger King Corporation, which operates and franchises a worldwide system of Burger King restaurants. She is also on the board of trustees of the University of St. Thomas.

6

Ms. Higgins Victor's roles with these strongly-branded public companies and academic institution give her extensive experience in the areas of established company cultures, executive compensation and human resources. Through her professional background, Ms. Higgins Victor brings to the Board large company leadership expertise, a dedication to continuous improvement and entrepreneurial experience.    In addition, her experience in executive development, succession planning and leadership coaching continues to be a valuable asset to the Board.

16.    Director Defendant Ronald James has been a director since May 2004.  Since 2000, he has served as president and chief executive officer of the Center for Ethical Business Cultures in Minneapolis, Minnesota, which assists business leaders in building ethical and profitable business cultures at the enterprise, community and global levels. From 1996 to 1998, he was president and chief executive officer of the Human Resources Group, a division of Ceridian Corporation, a business services company located in Minneapolis, Minnesota.  From 1971 to 1996, he was with US West Communications, Inc. (now Qwest Communications), most recently serving as Minnesota's top executive officer.  He gained investment fund knowledge through his service on the boards of RBC Funds, an investment fund of the Royal Bank of Canada, and Bremer Financial Corporation, a regional community banking company.  Having served on an advisory group to the United States Sentencing Commission, Mr. James speaks regularly at conferences on the subject of the Board's role in creating and sustaining ethical cultures.  He also serves on the boards of The Travelers Foundation, Speak the Word Church International, and the Guthrie Theater in Minneapolis, Minnesota and on a board committee for the Center for Healthcare Innovation, Allina Hospitals and Clinics in Minneapolis, Minnesota. He previously served as a director of St. Paul Companies (now The Travelers Companies, Inc.), Ceridian Corporation, Automotive Industries, and on the boards of Allina Hospitals and Clinics

7

and the Greater Twin Cities United Way. Mr. James brings governance expertise; large company leadership; telecommunications experience; a commitment to integrity, ethics and culture; and executive wisdom to the Board. In addition, his active participation as a consultant and educator in business ethics in academic settings, as well as for national and global organizations, provides valuable insight to the Board.

17. Director Defendant Elliot S. Kaplan has been a director and Secretary since January 1971. Since 1961, he has been an attorney with the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota, which serves as our primary external general counsel. He is also an owner and director of the Bank of Naples in Naples, Florida. In addition, he serves on the executive board of the Minnesota Historical Society and the board of the Robins, Kaplan, Miller & Ciresi Foundation for Children, and is a trustee of the University of Minnesota Foundation. He also previously served on the boards of infoUSA, Inc, a direct marketing company; The Minneapolis Institute of Arts; and PACER Center, an organization that seeks to expand opportunities for children and young adults with disabilities. His years of legal practice provide Mr. Kaplan with a deep understanding of business litigation, intellectual property litigation and licensing, antitrust and trade regulation, and corporate governance, all of which help Mr. Kaplan provide an experienced legal perspective to our Board. Mr. Kaplan also brings historical knowledge of our culture to the Board.

18. Director Defendant Sanjay Khosla has been a director since October 2008. In January 2007, he joined Kraft Foods, Inc., an international food and beverage company. He currently serves as executive vice president and president of Kraft developing markets and global categories. Prior to joining Kraft, he was with Fonterra Co-operative Group Ltd., a multi-national dairy company based in New Zealand, where he served as managing director of its

8

consumer and food service business. Before joining Fonterra in 2004, he had a 27-year career with Unilever PLC in India, the U.K. and Europe, culminating as senior vice president, global beverages, and chairman of Unilever's beverages category. Mr. Khosla also serves on the boards of NIIT Ltd., an IT-enabled education company in India, and Goodman Theatre in Chicago, Illinois. His many years in the consumer products industry provide Mr. Khosla with an extensive background in consumer marketing, branding, global expansion and multi-national operations. His background in these areas, along with his international perspective and history of transformational leadership, is valuable as the Board continues to focus on our global expansion and transformation.

19. Director Defendant George L. Mikan III has been a director since April 2008. Since November 2006, he has been the executive vice president and chief financial officer of UnitedHealth Group Incorporated. Mr. Mikan joined UnitedHealth in 1998 and has held various executive positions of increasing responsibility from 1998 to the present, including an executive role on the corporate development group responsible for merger and acquisition activities. From 1994 to 1998, he was employed at Arthur Andersen LLP. From his years at UnitedHealth and Arthur Andersen, Mr. Mikan gained solid financial and merger and acquisitions expertise, as well as public company leadership experience. This knowledge and experience is a valuable asset to the Board as we continue to explore growth opportunities, provide benefits for thousands of employees and position our company for financial growth.

20. Director Defendant Matthew H. Paull has been a director since September 2003. He has also been named our first Lead Independent Director and plans to serve in that role for the upcoming year. Mr. Paull is the former corporate senior executive vice president and chief financial officer for McDonald's Corporation, which develops, operates, franchises and services a

9

worldwide system of McDonald's restaurants. He retired from that position in January 2008. At McDonald's, Mr. Paull acquired a background in strong branding and consumer trends, knowledge that is highly relatable to our company. Prior to joining McDonald's Corporation in 1993, he was a partner at Ernst & Young LLP, specializing in international tax. He also serves on the advisory board of Pershing Square Capital Management, a New York-based hedge fund. Mr. Paull previously served as a trustee of the Ravinia Festival Association, which offers concerts and other entertainment in suburban Chicago, Illinois, and as an advisory council member for the Federal Reserve Bank of Chicago. As a former executive professor in residence at the University of San Diego, Mr. Paull also possesses an understanding of the academic world. Because of his professional experience, Mr. Paull has significant financial acumen, knowledge of hedge funds and investments, broad experience in global operations and extensive experience in tax matters, all of which enable Mr. Paull to make valuable contributions to our Board.

21.    Director Defendant Rogelio M. Rebolledo has been a director since August 2006. In 2007, Mr. Rebolledo retired from his position as chairman of PBG Mexico, the Mexican operations of The Pepsi Bottling Group, Inc., a manufacturer and distributor of Pepsi-Cola beverages. He began his 30-year career with PepsiCo in 1976 at Sabritas, the salty snack food unit of Frito-Lay International in Mexico. He was responsible for the development of the international Frito-Lay business, first in Latin America and then in Asia. From 2001 to 2003, he was president and chief executive officer of Frito-Lay International, a producer of snack foods. He also served as president and chief executive officer of The Pepsi Bottling Group's Mexico operations from January 2004 until being named chairman. Mr. Rebolledo also serves on the board of Kellogg Company, a manufacturer and marketer of ready-to-eat cereal and convenience foods.    He previously served on the boards of The Pepsi Bottling Group; Applebee's

10

International, Inc., a restaurant chain (now DineEquity, Inc.); and ALFA Corporation, a manufacturer of high-tech aluminum engine heads and blocks based in Mexico. His experience in oversight responsibility for multi-national operations and international expansion at Pepsi and Frito-Lay is highly valuable to the Board as it makes decisions about our international expansion. Through his time with these companies, in addition to his board service at Kellogg, Applebee's and ALFA, he brings a wealth of knowledge and experience in large company leadership, marketing, branding, international business and global market entry — key elements of our strategic priorities.

22.     Director Defendant Hatim A. Tyabji has been a director since April 1998. Since July 2001, he has been executive chairman of Bytemobile, Inc., a wireless Internet infrastructure provider in Santa Clara, California. From 1998 to 2000, he served as chairman and chief executive officer of Saraïde, Inc., a provider of Internet and wireless data services; and from 1986 to 1998, as president and chief executive officer (and as chairman from 1992 until 1998) of VeriFone, Inc., a global transaction automation enterprise. He is also chairman of Jasper Wireless, a global networking device company. Mr. Tyabji also serves on the boards of Merchant eSolutions, Inc.; Sierra Atlantic, Inc.; Touch Networks (Australia); and the Missile Defense Advocacy Alliance, and as an ambassador at large for Benchmark Capital. He previously served on the boards of Ariba Inc.; Bank of America Merchant Services; Deluxe Corporation; eFunds Corporation; Novatel Wireless, Inc.; PubliCard Inc.; SmartDisk Corporation; Datacard Group; Depotpoint, Inc.; Impresse Corporation and Norand Corporation, as well as on the boards of the Carnegie Institute, the Dean's Council of the Leavey School of Business at Santa Clara University and the Dean's Council of the School of Engineering at the State University of New York at Buffalo. In 2007, Mr. Tyabji published "Husband, Wife &

11

Company: An Honest Perspective on Success in Life and Work," a book on the interrelationships between family and career. Mr. Tyabji brings a wealth of experience in broadband and wireless technologies and is a significant contributor to the development of our technological growth and connected world strategy. His financial acumen and his background as an entrepreneurial business leader are valuable assets to the Board.

23. Director Defendant Gérard R. Vittecoq has been a director since September 2008. Since 2004, he has been a group president of Caterpillar, Inc., a manufacturer of construction and mining equipment, diesel and natural gas engines and industrial gas turbines based in Peoria, Illinois. He has responsibility for the company's Europe-Africa-Middle East ("EAME"), CIS (EAME) Distribution Services division, EAME Operations division, Marine, Petroleum and Power division, Electric Power division, and for the Caterpillar Production Center of Excellence division. He joined Caterpillar in 1975 and has held various accounting and finance positions within the company. From 1987 to 1990, he was in charge of strategy projects and was appointed director of strategy & planning in 1990. From 1995 to 1997, he was managing director of Caterpillar France S.A. In 1997, he became managing director of Caterpillar Belgium S.A. He was elected a vice president in January 2001, overseeing the EAME Product Development & Operations division. Through Mr. Vittecoq's tenure with Caterpillar, he has gained international management experience, branding knowledge and financial expertise. He is a member of the IMD (International Institute for Management Development) Foundation board, a member of the Evian Group: Free Trade Think Tank, an executive member of the World Business Council for Sustainable Development and a vice president of the board of the Swiss-American Chamber of Commerce. Mr. Vittecoq's background as an accomplished business leader and his financial

12

acumen, in addition to his political savvy, are valuable assets to the Board as it focuses on our further expansion in the global marketplace.

## DUTIES OF DIRECTOR DEFENDANTS

24.     By reason of their positions as officers, directors and/or fiduciaries of Best Buy and because of their ability to control the business and corporate affairs of Best Buy, the Director Defendants owe and owed Best Buy and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, were and are required to use their utmost ability to control and manage Best Buy in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Best Buy and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of Best Buy owes to Best Buy the fiduciary duty to exercise due care and diligence in the administration of the affairs of Best Buy and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants have a duty to mange the Company's exposure to litigation and related expenses and damages in order to prevent losses.

26.     In addition, as officers and/or directors of a publicly-held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations so that the market price of the Company's common stock would be based on truthful and accurate information.

27.     The Director Defendants, because of their positions of control and authority as directors an/or officers of Best Buy, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements,

13

including marketing materials issued by the Company. Because of their advisory, executive, managerial and directorial positions with Best Buy, each of the Director Defendants had access to adverse non-public information about the operations of Best Buy, including, without limitation, the fraud and related misconduct in which the Director Defendants caused Best Buy to engage.

28.     By knowingly engaging in and/or acquiescing in the wrongful conduct complained of herein, the Director Defendants breached the fiduciary duties that each of them owed to Best Buy and Best Buy's shareholders and has caused Best Buy to be exposed to hundreds of millions dollars in potential civil liability. Additionally, Best Buy has had to and will continue to incur millions of dollars in damages, legal fees and other injuries described more fully herein.

29.     At all material times hereto, each of the Director Defendants was the agent of each of the other Director Defendants and of Best Buy, and was at all times acting within the course and scope of said agency.

30.     To discharge their duties, the officers and directors of Best Buy were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of Best Buy. By virtue of such duties, the officers and directors of Best Buy were required, among other things, to:

        a.      manage, conduct, supervise and direct the business affairs of Best Buy in accordance with federal and state law and federal rules and regulations and the charter and bylaws of Best Buy;

        b.      neither violate nor knowingly permit any officer, director, or employee of Best Buy to violate applicable federal laws, rules and regulations and/or state law;

14

c.      establish and maintain systematic and accurate reports and records of the

business and affairs of Best Buy and procedures for the reporting of the business and affairs to

the Board of Directors and to periodically investigate, or cause independent investigation to be

made of said reports and records;

d.      maintain and implement an adequate and functioning system of internal

financial and accounting controls, such that Best Buy's financial statements and information

would be accurate;

e.      exercise reasonable control and supervision over the Company's public;

f.      remain informed as to the status of Best Buy operations, and upon receipt

of notice or information of imprudent or unsound practices, to make a reasonable inquiry in

connection therewith, and to take steps to correct such conditions or practices and make such

disclosures as are necessary to comply with state and federal securities laws; and

g.      supervise the preparation and filing of any audits, reports or other

information required by law from Best Buy and to examine and evaluate any reports of

examinations, audits or other financial information concerning the financial affairs of Best Buy

and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the

subjects and duties set forth above.

31.    During all relevant times hereto, each of the Director Defendants occupied

positions with Best Buy or were associated with the Company in such a manner as to make them

privy to confidential and proprietary information concerning Best Buy.  Because of these

positions and such access, each of the Director Defendants knew that the adverse facts specified

herein had not been disclosed to and were concealed from the public. The Director Defendants,

as corporate fiduciaries entrusted with non-public information, were and are obligated to disclose

15

material, adverse information regarding Best Buy and to abstain from trading on such information so as to profit from its misuse.

## CORPORATE DUTIES

32.     The table below illustrates the Director Defendants membership on the five standing committees of the Board during the relevant period of this action.

| Committee | | Members |
|-----------|---|---------|
| | | |
| Audit | | Hatim A. Tyabji<br>George L. Mikan III<br>Matthew H. Paull<br>Gérard R. Vittecoq |
| | | |
| Compensation and Human Resources | | Ronald James<br>Kathy J. Higgins Victor<br>George L. Mikan III<br>Hatim A. Tyabji |
| | | |
| Nominating, Corporate Governance and Public Policy | | Kathy J. Higgins Victor<br>Sanjay Khosla<br>Rogelio M. Rebolledo |
| | | |
| Finance and Investment Policy | | Elliot S. Kaplan<br>Ronald James<br>Matthew H. Paull<br>Gérard R. Vittecoq |
| | | |
| Global Strategy Committee | | Sanjay Khosla<br>Lisa M. Caputo<br>Rogelio M. Rebolledo |

### *Audit Committee*

33.     According to the Company's Proxy Statement the purpose of the Audit Committee includes but is not limited to the following:

> This committee discharges the Board's oversight responsibility to our shareholders and the investment community regarding: (i) the integrity of our financial statements and financial reporting processes; (ii) our internal accounting systems and financial and operational controls; (iii) the qualifications

and independence of our independent registered public accounting firm; (iv) the performance of our internal audit function and our independent registered public accounting firm; and (v) our compliance with ethics programs, including our Code of Business Ethics, and legal, regulatory and risk oversight requirements. In carrying out these duties, this committee maintains free and open communication between the Board, our independent registered public accounting firm, our internal auditors and management. This committee meets with management, our internal audit staff and our independent registered public accounting firm at least quarterly. In addition, this committee conducts quarterly conference calls with management and our independent registered public accounting firm prior to our earnings releases to discuss the results of our independent registered public accounting firm's quarterly reviews and fiscal year-end audit.

### Compensation and Human Resources Committee

34.     According to the Company's Proxy Statement the purposes of the Compensation

and Human Resources Committee includes but is not limited to the following:

This committee discharges the Board's responsibilities related to executive officer and director compensation, including the establishment of our executive officer and director compensation philosophies, and evaluation of our CEO. Oversight responsibilities of this committee include succession planning and compensation-related risk oversight. This committee also oversees the development and evaluation of, and approves, equity-based and other incentive compensation and other employee benefit plans of a compensatory nature, and oversees our human capital policies and programs.

### Nominating Corporate Governance and Public Policy Committee

35.     According to the Company's Proxy Statement the purposes of the Nominating

Corporate Governance and Public Policy Committee includes but is not limited to the following:

This committee discharges the Board's responsibilities related to general corporate governance, including Board organization, membership, training and evaluation. It also reviews and recommends to the Board corporate governance principles, presents qualified individuals for election to the Board, and oversees the evaluation of the performance of the Board and its committees. Finally, this committee oversees matters of public policy and social responsibility that affect us domestically and internationally. For additional information regarding our director nomination process, see Director Nomination Process beginning on page 15.

### *Finance and Investment Policy Committee*

36.   According to the Company's Proxy Statement the purposes of the Finance and

Investment Policy Committee includes but is not limited to the following:

This committee advises the Board regarding our financial policies and financial condition to help enable us to achieve our long-range goals. It evaluates and monitors the: (i) protection and safety of our cash and investments; (ii) achievement of reasonable returns on financial assets within acceptable risk tolerance; (iii) maintenance of adequate liquidity to support our activities; (iv) assessment of the cost and availability of capital; and (v) alignment of our strategic goals and financial resources.

### *Global Strategy Committee*

37.   According to the Company's Proxy Statement the purpose of the Global Strategy

Committee includes but is not limited to:

This committee was established in January 2010, but did not have assigned members or meet during the fiscal year. The committee was created to provide insight, advice and counsel with respect to our strategic plans regarding connectivity, marketing, branding, customer centricity, and related enterprise initiatives. The committee will also provide an ongoing critical evaluation of, and accountability for performance within, our strategic plans and vision.

38.   Additionally, the Company's Proxy Statement provides:

Our Board is responsible for oversight of enterprise risk. The Board considers enterprise risk factors as a critical element of its review of business strategy and performance and ensures that there is an appropriate balance of risk and opportunity. Management is responsible for the day-to-day risk management processes and their activities include assessing and taking actions necessary to manage risk incurred in connection with the operation of our business. Management reviews significant enterprise risks and our general risk management strategy with the Board. We believe this division of responsibilities is the most effective approach for addressing the risks we face and that our Board leadership structure supports this approach.

In connection with the Board's oversight function, each of the committees of the Board has principal responsibility for reviewing and discussing with management those risk exposures (i) specified in their charters, or (ii) identified from time to time by the committees themselves, as follows:

18

- Our Audit Committee is responsible for oversight of risk associated with our financial controls and compliance activities. The Audit Committee also oversees management's processes to identify and quantify the material risks facing us. Our internal audit staff, who report directly to the Audit Committee, assists us in identifying, evaluating and implementing risk management controls and procedures to address identified risks. Internal audit reports to the Audit Committee at least quarterly. In connection with its risk oversight role, the Audit Committee meets privately with members of our independent registered public accounting firms, our internal audit staff and the legal staff.

- Our Compensation Committee is responsible for oversight associated with our compensation plans.

- Our Finance and Investment Policy Committee is responsible for oversight of risk associated with our investment portfolio and liquidity risks.

- Our Nominating Committee is responsible for the oversight of board processes and corporate governance related risk, as well as, our activities in the public policy and social responsibility arenas.

In connection with their oversight of compensation-related risks, Compensation Committee members periodically review the most important enterprise risks to ensure that compensation programs do not encourage risk-taking that is reasonably likely to have a material adverse effect on us. With the help of the Compensation Committee's independent compensation consultant, in fiscal 2010, the Compensation Committee reviewed our compensation policies and practices for all employees, including executive officers. The review process identified our existing risk management framework and the key business risks that may materially affect us; reviewed all compensation plans and identified those plans that are most likely to impact these risks or introduce new risks; and balanced these risks against our existing processes and compensation program safeguards. The review process also took into account mitigating features contained within our compensation plan design which includes elements such as:

- metric-based pay,

- time matching,

- payment for outputs,

- goal diversification,

- payment caps, and

- clawbacks.

The Compensation Committee also considered other controls outside of compensation plan design which contribute to risk mitigation, including the weight placed on values in our performance management process, the independence of our performance measurement teams, and our internal control environment.

Based upon the process we employed, we determined that our compensation programs do not encourage risk-taking that is reasonably likely to result in a material adverse effect on us.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

39.    Plaintiff brings this action derivatively in the right and for the benefit of Best Buy to redress injuries suffered, and to be suffered, by Best Buy as a direct result of the breaches of fiduciary duty, violations of law, gross mismanagement, abuse of control, unjust enrichment and waste of corporate assets, as well as the aiding and abetting thereof, by the Director Defendants. This is not a collusive action to confer jurisdiction on this Court which it would otherwise lack. Best Buy is named as a nominal defendant solely in a derivative capacity.

40.    Plaintiff will adequately and fairly represent the interests of Best Buy and its shareholders in enforcing and prosecuting its rights.

41.    Plaintiff is and was an owner of the stock of Best Buy during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

42.    The present Board of Directors consists of twelve members. Plaintiff has not made any demand on the present Board of Directors of Best Buy to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons outlined below:

43.    The Best Buy Board of Directors and senior officers participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or

20

disguise the wrongs from Best Buy stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties. As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of Best Buy had actual or constructive knowledge regarding the misrepresentations in the Company's earnings projections.

44.     As a director of Best Buy, each Board member had and has specific duties he owed to the Company and its shareholders. In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from Best Buy's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein.     Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subjecting the Company to millions of dollars in liability for potential violations of applicable securities laws.

45.     In total, the Director Defendants Richard M. Schulze, Brian J. Dunn, Elliot S. Kaplan, and Kathy J. Higgins Victor sold nearly 685,000 shares of Best Buy stock since October 2009, receiving almost $29 million in proceeds from these illegal insider sales. Because these Director Defendants received a substantial personal benefit from the challenged insider sales transactions, these Defendants are interested.     These Defendants face potential liability for breach of their fiduciary duties not to trade shares of Best Buy stock while in possession of adverse material, non-public information. Because these Defendants are interested and have

21

breached their fiduciary duties, any demand upon them clearly would be futile. The insider sales

are reflected as follows:

## RICHARD M. SHULZE (FOUNDER, CHAIRMAN)

11/20/09 SOLD 500,000 shares, resulting in proceeds of $21.621 Million
10/19/09 SOLD 23,700 shares, resulting in proceeds of $971,700
10/15/09 SOLD 58,600 shares, resulting in proceeds of $2.402 Million
Total Proceeds: $24.994 Million

## BRIAN J. DUNN (CEO):

04/21/2011 SOLD 43,123 shares, resulting in proceeds of $1.298 Million
04/01/2010 SOLD 13,848 shares, resulting in proceeds of $591,765
Total Proceeds: $1.889 Million

## ELLIOT S. KAPLAN (Director):

10/26/10 SOLD 11,250 shares, resulting in proceeds of $482,000
04/26/10 SOLD 11,250 shares, resulting in proceeds of $545,221
02/10/10 SOLD 11,250 shares, resulting in proceeds of $400,275
Total Proceeds: $1.427 Million

## KATHY J. HIGGINS VICTOR (Director):

11/19/09 SOLD 11,250 shares, resulting in proceeds of $481,500

46. Director Defendants Richard M. Schulze and Brian J. Dunn serve as the Chairman

of the Board and CEO respectively. As a result of their high-level positions with the Company,

they admittedly are not independent under either Company's own Director Independence

Standards or the listing standards of the New York Stock Exchange. Moreover, the Company

concedes that under the aforementioned independence standards, Director Defendant Elliot S.

Kaplan is not independent. Because these Defendants are interested and have breached their

fiduciary duties, any demand upon them clearly would be futile.

47. Director Defendants Hatim A. Tyabji, George L. Mikan III, Matthew H. Paull,

and Gérard R. Vittecoq serve on the Audit Committee, which allowed the Company to defraud

its clients and shareholders in contrivance of their duties to oversee Company compliance with legal and regulatory requirements. Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile.

48. Director Defendant Caputo, is managing director and senior banker of the Public Sector Group within the Institutional Client's Group at Citigroup, Inc. Citigroup, Inc. and/or its subsidiaries ("Citi") which provides financial services to the Company, including participating as a lender under Best Buy's Revolving Credit Agreement ("Revolver"). Citi receives interest payments through the Company's lending agent from this relationship to the extent the agent has drawn down funds from Citi, as well as, fees for providing us access to funds through the Revolver. As a result of this lending relationship, Ms. Caputo is not independent and demand against her would be futile.

49. Director Defendant Mikan is executive vice president of UnitedHealth Group Incorporated ("UnitedHealth") and chief executive officer of OptumHealth, an affiliate of UnitedHealth. Since 2003, the Company has had a health benefit services agreement with UnitedHealth. In light of this business relationship, Mr. Mikan is not independent and demand against him would be futile.

50. Further, the Director Defendants will take no action against one another or against any member of the Board because each member of the Board has received thousands of dollars in compensation in the form of salary, bonuses, stock options, director fees, charitable contributions and other such compensation (see table below) in exchange for their purported trust, loyalty, fidelity and due care. As illustrative of the lavish compensation each Director Defendant enjoys and is interested in protecting and thus not independent; therefore, making demand upon any of them futile.

### *Director Summary Compensation Table*

51.    The following table summarizes the compensation earned during fiscal 2011 by our non-management directors, as well as by Messrs. Schulze and Anderson (management directors who were not our full-time employees in fiscal 2011):

| Name | Fees Earned or Paid In Cash | Option Awards | Non-qualified Deferred compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|
| Bradbury H. Anderson | $------- | $ 147,200 | $------- | $ 79,446 | $ 226,646 |
| Lisa M. Caputo | 75,000 | 147,000 | ------- | ------ | 222,200 |
| Kathy J. Higgins Victor | 85,000 | 147,200 | ------ | ------- | 232,200 |
| Ronald James | 86,250 | 147,200 | ------ | ------- | 223,450 |
| Elliot S. Kaplan* | 85,000 | 147,200 | ------- | ------- | 232,200 |
| Sanjay Khosla | 82,500 | 147,200 | ------- | ------ | 229,700 |
| Allen U. Lenzmeier | 24,107 | 147,200 | ------- | ------ | 165,950 |
| George L. Mikan III | 75,000 | 147,200 | ------- | ------ | 222,200 |
| Matthew H. Paull | 82,500 | 147,200 | ------- | ------ | 229,700 |
| Rogelio M. Rebolledo | 75,000 | 147,200 | ------- | ------- | 222,200 |
| Richard M. Schulze | ------- | ------ | ------ | 166,655 | 161,406 |
| Frank D. Trestman | 28,929 | 147,200 | ------- | 18,750 | 188,629 |
| Hatim A. Tyabji | 90,000 | 147,200 | ------ | ------ | 237,200 |
| Gérard R. Vittecoq | 75,000 | 147,200 | ------- | ------ | 222,200 |

*    *Indicates a director who will not be standing for re-election on June 24, 2010. Messrs. Anderson, Lenzmeier and Trestman did not stand for re-election on June 24, 2010. Their serve as directors ended effective as of that date.*

52.     The continuation of the remuneration illustrated above and paid by the Company to each Director Defendant is dependent upon his or her cooperation with the other members of the Board, and his or her participation and acquiescence in the wrongdoing set forth herein, and each member is therefore incapable of exercising independent objective judgment in deciding whether to bring this action. Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

53.     In order to bring this suit, all of the directors of Best Buy would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

54.     The acts complained of constitute violations of the fiduciary duties owed by Best Buy's officers and directors and these acts are incapable of ratification.

55.     Any suit by the directors of Best Buy to remedy these wrongs would likely expose the Director Defendants and Best Buy to further violations of the securities laws, which would result in civil actions being filed against one or more of the Director Defendants and thus they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

56.     Best Buy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Best Buy any part of the damages the Company suffered and will suffer thereby.

57.     If Best Buy's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their acts of mismanagement, waste

and breach of fiduciary duty alleged in this Complaint, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Best Buy. Due, however, to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Best Buy against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these Director Defendants were to sue themselves or certain of the officers of Best Buy, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. In the absence of liability insurance coverage, as would occur if a similar suit were filed by the Company itself, the Director Defendants would not cause Best Buy to sue themselves, since they will face a large uninsured liability.

58.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Director Defendants have failed and refused to seek to recover for Best Buy for any of the wrongdoing alleged by Plaintiff herein.

59.    Plaintiff has not made any demand on shareholders of Best Buy to institute this action since such demand would be a futile and useless act for the following reasons:

    a.    Best Buy is a publicly traded company with thousands of holders of record;

26

b.      Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could be individually identified.

## SUBSTANTIVE ALLEGATIONS

60.     On March 25, 2010, the Company issued its 4Q FY 2010 financial results and held a conference call for analysts and investors. During that call, the defendants discussed the financial results for 2010 and the outlook for financial results in FY 2011. The defendants emphasized that in FY 2010 the Company defied the experts who predicted the slowing economy and rising unemployment would cause conservative sales for the Company. On this call, defendants also reiterated the guidance for FY 2011 revenue and earnings including a 1-3% increase in comparable stores sales;

[DUNN:]       [In] [c]alendar 2009 . . . [e]perts said that rising unemployment would derail consumer spending . . . .

. . . Most of these things did happen, but you know what? . . . Best Buy experienced significant year-over-year increases in unit volumes in each of the three major screens, notebooks, televisions and mobile phones.

61.     On June 15, 2010, the Company reported its 1Q'11 financial results - EPS of $0.36, which drastically missed the Wall Street consensus estimate of $0.50 per share. The Company held a conference call to discuss its 1Q'11 financial results, during which defendants acknowledged that week 1Q'11 financial results were due to slower demand and slower traffic in U.S. stores, even though consumer spending had increased from 2009.

[DUNN:]       *[W]hile I'm neither please nor satisfied with our first-quarter financial results, it does not change my confidence that we can and will deliver our annual guidance and drive value for the long term.*

&ast;  &ast;  &ast;

*Finally, we continue to expect to deliver our financial goals for the year.  We are maintaining our annual guidance expectations of strong EPS growth of 10% to 14% driven by top line growth and expansion of our operating margins.*

&ast;  &ast;  &ast;

*[W]e've not changed our guidance expectations for the top line either in total revenue growth or in comp sales.*

62. On September 14, 2010, the Company issued its financial results for 2Q11 in a press release.  The Company reported 2Q11 EPS of a whopping $0.60 per share, well above Wall Street estimates of $0.40, and lower SG&A expenses.  However, the Company also reported domestic comparable-store sales declines of 1.4% acknowledged declines in TV sales and a decline in market share in mobile computing and entertainment hardware and software. Weak sales also caused inventories to increase by 6%.  Presumably referring to lower SG&A expenses and the positive earnings impact of stock repurchases, the Company admitted that "while there are many moving pieces that we manage . . . our earnings are essentially in line with our original expectations for the year as strong gross profit rates and cost control plans work to offset softer top line growth."

63. Simultaneously, the Company reduced its FY 2011 top-line revenue forecast by $1 billion and reduces its forecasted comparable store sales forecast to growth of only 1%-2%. The Company nevertheless bullishly *increased FY 2011 forecasted operating income growth from 30-40 bps to 40-55 bps, and boosted its earnings forecast from $3.45-$3.60 to $3.55-$3.70 per share*, reportedly to reflect stock repurchases, which had already occurred in the first half, stating:

28

**Best Buy's Second Quarter Diluted EPS Grows 62% Year-Over-Year to $0.60**

Company Significantly Increased Operating Margin in the Quarter

Company Completed Share Repurchases Totaling $700 Million During the First Fiscal Half

Fiscal 2011 Diluted EPS Guidance Increased to $3.55 to $3.70

\*        \*        \*

The Domestic segment's fiscal second quarter revenue totaled $8.4 billion, an increase of 2 percent versus the prior-year period. This increase was driven by the addition of net new stores, partially offset by a comparable store sales decline of 1 percent. **The comparable store sales results were driven primarily by a decline in customer traffic, partially offset by an increase in average ticket . . . . [L]ow-double digit comparable store sales decline in TCs was drive by a low double-digit decline in unit sales and moderating price declines.**

\*        \*        \*

**[D]omestic market share declined 50 basis points versus the comparable period last year for the three months ended July 2010 . . . . The company noted that it continues to expect to increase its market share for the full fiscal year.**

64.    The September 14, 2010 press release added that during 2Q11, Best Buy had repurchased $600 million worth of its stock compared to only $100 million in 1Q11. In a shift in the components of the FY 2011 earnings forecast, the Company attributed the $0.10 EPS increase in forecasted earnings to the impact of $700 million in share repurchases (20 million shares), which had occurred in the first half of the year. The Company expressly disclaimed the impact of any second half share repurchase on the current, yet increased, earnings forecast:

- Share repurchases totaled approximately $600 million in the second fiscal quarter (approximately $700 million in shares repurchased for the first fiscal half) . . . .

- *Fiscal 2011 diluted EPS guidance increased by 10 cents to $3.55 to $3.70 to reflect impact of share repurchases completed in the first fiscal half (the new guidance range excludes the impact of potential share repurchases that may be completed in the second fiscal half).*

65.     On the same day, September 14, 2010, the Company hosted a conference call for

analysts and investors to discuss the 2D11 financial results. The Company explained its weak

2Q11 sales results, its reduced revenue expectations and the purported basis of its increase in FY

2011 earnings prospects.     Defendants further assured investors that notwithstanding sales

declines, the Company was *"on track to deliver and exceed our annual EPS guidance"*:

> [MUEHLBAUER:]  Overall, revenue grew 3% to $11.3 billion, on comparable
> store sales that were essentially flat versus last year. **This revenue performance
> included domestic comparable store sales declines of 1.4%.** This decline was
> driven primarily by softness in customer traffic patterns that resulted in lower
> sales across categories such as home theater, entertainment hardware and
> software.

*     *     *

> So looking at the results for the first half of fiscal 2011 . . . *we are pleased
> that our earnings are essentially in line with our original expectations for the
> year* . . . .

*     *     *

> First, looking at revenue, given the softness experienced year-to-date, we
> have lowered our revenue expectations to approximately $52 billion. As a result,
> we now anticipate comp sales - comp store sales growth 1% to 2% for the full
> year . . . .

*     *     *

> [W]e now expect to deliver 40 to 55 basis points of operating income
> improvement versus last year . . . . In total, these assumptions along with the
> favorable impact of share repurchase activity completed in the first half, now lead
> us to an earnings per share *guidance range for the year of $3.55 to $3.70, an
> increase of 13% to 18% versus last year, and $1.10 higher that our original
> range.*
>
> . . . *Overall, we are pleased that we are on track to deliver and exceed
> our annual EPS guidance.*

66.     During the call, analysts questioned defendants as they had after the 1Q11

revenue and earnings miss, on the basis of their belief that top-line revenue in the second half

would significantly accelerate to support the Company's guidance. In response, the Company

assured investors that customer demand for new products would drive revenue, particularly

during the holiday season, because customers "overindex their wallet share into CE products,"

and that there was no reason that the 2010 holiday season would be any different. The Company

added that while it knew that TV sales had been weak, promotions in the holiday season would

unlock "a lot of pent up demand:"

> [ANALYST:] Obviously the gross margin gains are very admirable and we applaud the move to buy back a significant amount of stock in the second quarter but, nevertheless, *the revenue guidance is lower than what you originally articulated, and you now you're looking for comps in the second half to be 1% to 3% in the wake of significantly more difficult compares. Jim, could you maybe just elaborate a little bit more on why you think the revenue line specifically is going to accelerate to a pretty significant extent in the back half of the year and in particular the holiday season?*

> [MUEHLBAUER:] Yes, thanks, Alan.

> As we look at the back half of the year . . .[w]e know during the holiday season that customers over-index their wallet share into CE products. *We have no reason to believe this holiday season is going to be any different.* As a matter of fact what we have seen during several drive times, especially when we have new hot products, we have customer demand for those hot products.

> *   *   *

> [ANALYST:] I guess the question I have, as we went through the quarter, we got closer to the tradition family stronger football season, . . .did you see an improving trend there in the TV category, particularly with some of the new technologies now in the stores?

> [VITELLI:] Generally, not. Generally, the overall TV industry has been relatively flat. I think that's partially as I said earlier, I think it's partially because the industry hasn't been very promotional in the first half.

> *As Jim mentioned, we believe, in fact, we know that it's going to get more exciting promotionally in home theater in the second half. I think there's been a lot of pent-up demand, both from a consumer point of view*, to get some exiting promotions going and I think we're going to see more of that in the second half.

67.     On September 15, 2010, BB&T issued a report on the Company's 2Q11 financial

results, expressing their delight with the Company's increased FY 2011 earnings forecast and

confidence that consumer spending would increase during the holiday season. The report

reiterated defendants' aggressive earnings forecast as follows:

> [D]iluted EPS jumped 62.2% to $0.60, beating our estimate and consensus by
> $0.14. Management raised its FY'10 diluted guidance to $3.55-$3.70 from $3.45-
> $3.60 . . . .

*     *     *

- *Management believes consumer spending on electronics will pick up in*
  *H2'10, driven by a higher allocation of holiday spending on electronics;*
  *increased iPad availability; new motion-based video gaming platforms;*
  *new product introductions in tablet computing and increased sales of e-*
  *readers.*

*     *     *

> *We were impressed by Best Buy's much better-than-expected Q2'10*
> *earnings and FY'10 guidance raise, which reaffirms our positive long-term*
> *outlook on the company.*

68.     After the Company's September 14, 2010 financial report and conference call, the

Company's stock price increased from a close of $34.65 per share on September 13, 2010 to a

close of $36.73 per share on September 14, 2010, on volume of more than 21 million shares

traded. By September 27, 2010, Best Buy stock was trading above $40 per share.

69.     On November 26, 2010, the day after Thanksgiving (dubbed "Black Friday"),

Dunn was interviewed by Bloomberg on the topic of in store traffic and the Company's sales

promotion for the holiday season:

> *[T]raffic across the country, measured by the lines in front of our stores, is*
> *longer this year than last year, and the traffic to our website is greater this year*
> *than it was last year.*

*     *     *

*[A]necdotally, the traffic reports we have from around the county are better than they were even two years ago.*

*     *     *

[W]e're offering customers great prices . . . and *it's going to be great for our shareholders*.

70.     On and after November 26, 2010, Best Buy's stock continued to trade at levels above $42 per share.

**THE TRUE FACTS AND FINANCIAL CONDITION
OF THE COMPANY BEGIN TO BE DISCLOSED**

71.     On December 14, 2010, the Company reported its 3Q11 financial results in a press release. The results shocked investors, as the Company reported that it had again missed Wall Street analyst revenue and earnings expectations by a wide margin, domestic comparable-store sales had declined, and the Company had lost market share. Further, notwithstanding the increase FY 2011 earnings forecast after the 2Q11 results, the Company slashed its FY 2011 earnings forecast of $3.55-$3.70 per share by up to $0.50 t0 $3.20-$3.40 per share - well below even the initial earnings forecasts of $3.45-$3.60 per share set in March 2010.

72.     The Company additionally noted that in 3Q11 it had repurchased another 11 million shares of its stock at a cost of $420 million, bringing the total for the first three quarters of FY2011 to 31 million shares. In addition, the Company stated that its new lower FY 2011 earnings expectations of $3.20-$3.40 per share *included* the positive impact of the share repurchases of $0.12 on fiscal year earnings estimates. Thus, but for 31 million shares repurchased in the first three quarters of FY 2011, earning expectations cold be **as low as $3.08 per share**. The December 14, 2010 press release stated:

**Fiscal Third Quarter 2011 Summary:**

- Domestic segment's comparable store sales declined 5.0% . . .

33

- Domestic segment's gross profit rate up 90 basis points . . .

- Tight cost controls limited total company SG&A dollar growth to 1 percent year-over-year.

- Updated diluted EPS guidance range for fiscal 2011 of $3.20 to $3.40 (previous guidance range was $3.55 to $3.70), *driven primarily by lower domestic revenue expectations partially offset by continued improved gross margin rates and control over variable expenses*.

- Share repurchases totaled $420 million in the fiscal third quarter (approximately $1.1 billion in shares repurchased fiscal year-to-date). Best Buy Co., Inc., the world's leading retailer of consumer electronics, today reported net earnings of $217 million, or $0.54 per diluted share, for its fiscal third quarter ended November 27, 2010, compared with $227 million, or $0.53 per diluted share, for the prior-year period.

*       *       *

*The Company estimates that its domestic market share declined 110 basis points . . . . The decline was driven primarily by declines in TVs, mobile computing and gaming software. Based on fiscal year-to-date trends, the company now estimates that its domestic market share will decline for the full fiscal year as compared to the prior year.*

*"Based on lower than expected sales and earnings in the fiscal third quarter, and given our current visibility to potential outcomes in the fiscal fourth quarter, we now expect annual earnings to be below our previous fiscal 2011 EPS guidance . . . .However, our best view today is that we now expect annual EPS in the range of $3.20 to $3.40."*

73.     On December 14, 2010, the Company held a conference call for analysts and investors. The call was hosted by defendants Dunn, Meuhlbauer and Vitelli. Defendants attempted to explain the earnings miss resulting from slow sales across the board, including those products defendants claimed would drive in store traffic, and the reduction in the FY 2011 earnings forecast, admitted that the Company's "top line growth assumptions earlier in the year turned out to be too aggressive":

[DUNN:] *Our sales in the US, however, were lower than we expected for the quarter. And as a result, earnings were less than we anticipated.*

34

\*       \*       \*

*The newer technologies like 3D and IPTV . . . . have been slower to take hold . .
. .*

*The notebook market was weaker than we expected . . . .*

*The gaming sector lagged our expectations.*

\*       \*       \*

[MUEHLBAUER:]  As you noticed in our release this morning, *the single largest driver of our softer-than-expected performance in the quarter was the comparable store sales decline in the domestic segment . . . .*

\*       \*       \*

*[O]ur top line growth assumptions earlier in the year turned out to be too aggressive based on the environment that we see for demand, specifically in the TV industry and the computing industry overall . . . .*

74.     The Company also announced that, in addition to an earnings miss and reductions in its FY 2011 earnings forecast, during the quarter the Company repurchased another 11 million shares of its common stock, bringing the total for the year to 31 million shares, which would have a $0.12 impact on the Company's FY 2011 earnings result.

75.     Defendants December 14, 2010 disclosures shocked investors and sent the Company's stock price plummeting 14% on massive volume (more than 64 million shares), from a closing price of $41.70 per share on December 13, 2010 to $35.52 per share on December 14, 2010.

76.     On December 15, 2010, BB&T capital Markets issued a report discussing the Company's earnings miss and FY 2011 forecast reduction.  The report particularly questioned why Company executives, knowing in 2Q11 that television and PC sales were slowing, decided to raise the fiscal year forecast:

BBY: NOT MUCH TO LIKE ABOUT Q3 "MISS AND LOWER"

- **Best Buy reports worse-than-expected Q3;10 results, lowers FY'10 guidance.** Revenue declined 1.1% to $11.9B and diluted EPS increased 1.9% to $0.54, missing our estimate and consensus by $0.10 and $0.07, respectively. Management lowered its FY'10 EPS guidance to $3.20-$3.40 from $3.55-$3.70.

*   *   *

- *Q3 "miss and lower" surprising given recent guidance raise. We believe Best Buy's earnings miss and guidance reduction were all the more disappointing given the fact management had a "free pass" to reduce guidance going into the Q2 earnings release amid widespread reports of slowing television and PC sales, and instead raised its FY'10 forecast.*

*   *   *

In addition, Q3 marks the second time this year Best Buy has come up short of consensus estimates and is the latest of a number of earnings misses over the last few years. *We believe these periodic earnings disappointments negatively impact management's credibility with investors . . . .*

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duty

77.     Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

78.     As alleged herein the Director Defendants owed and owe Best Buy fiduciary duties. By reason of their fiduciary relationships, the Director Defendants owed and owe Best Buy the highest obligations of fidelity, trust, loyalty and due care. Additionally, each Director Defendant owed and owes Best Buy a duty to ensure that the Company operates in a diligent, fair, honest and equitable manner and complied with all applicable federal and state laws, rules and regulations.

79.     Each of the Director Defendants knew, should have known, or recklessly disregarded that the Director Defendants violated and breached their fiduciary duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

36

80.    Each of the Director Defendants had actual or constructive knowledge of the misrepresentations related to the Company's earnings projections, and failed to correct the Company's public misrepresentations and material misstatements and/or omissions.    These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

81.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary duties the Company has suffered significant damages.

82.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Violations of Section 10(b) and Rule 10b-5 of the

### Securities and Exchange Act against All Defendants

83.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Best Buy not misleading.

85.    Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Best Buy.

86.    Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through marketing materials, press releases, news reports and filings with the SEC.

87.    Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding Best Buy.

88.    By virtue of the foregoing, Defendants have violated §10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

### THIRD CAUSE OF ACTION

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

89.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

90.    At the time of the stock sales by the Insider Selling Defendants set forth herein, each Insider Selling Defendant knew or should have known of the inaccurate earnings projections.

91.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's was misrepresenting its expected financial performance.  The Insider Selling Defendants' sales of the Company's common stock while in possession and control of this

38

material adverse non-public information was a breach of their fiduciary duties of good faith and loyalty.

92.     Because the Insider Selling Defendants' use of the Company's proprietary information for their personal gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, Best Buy is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## FOURTH CAUSE OF ACTION

### Against All Director Defendants for Gross Mismanagement

93.     Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

94.     By their actions and/or inaction alleged herein, the Director Defendants, directly, indirectly, knowingly, willfully and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of Best Buy in a manner consistent with the operations of a public company.

95.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Best Buy has sustained significant damages.

96.     As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Director Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### Against All Director Defendants for Abuse of Control

97.     Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

98.     The Director Defendants' misconduct alleged herein constituted an abuse of their

ability to control and influence Best Buy, for which they are legally responsible.

99.    As a result of the Director Defendants' abuse of control, Best Buy has sustained significant damages.

100.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

### Against All Director Defendants for Unjust Enrichment and

### Waste of Corporate Assets

101.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

102.    As a result of the Director Defendants' foregoing conduct, the Director Defendants have caused Best Buy to waste valuable assets and have subjected the Company to potential civil penalties and material liability for securities fraud, possibly reaching in excess of a billion dollars in damages, as well as significant legal defense fees.

103.    As a result of the Director Defendants' conduct described herein and as a result of the huge profits realized in illegal insider trading by the Insider Selling Defendants and the huge profits realized in bonuses and other compensation by the Director Defendants, all of the Director Defendants have been unjustly enriched and/or aided and abetted in the unjust enrichment of the other Director Defendants at the expense of Best Buy and its shareholders.

104.    The Director Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Best Buy and its shareholders. A constructive trust for the benefit of Best Buy and its shareholders should be imposed upon those proceeds.

105.    As a direct and proximate result of the Director Defendants' unjust enrichment and waste of corporate assets Best Buy has sustained significant damages.

106.    As a direct and proximate result of the misconduct alleged herein, the Director Defendants are liable to the Company.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that the Director Defendants, and each of them, have committed breaches of their fiduciary duties to Best Buy;

B.    Requiring the Director Defendants to pay Best Buy the amounts by which the Company has been damaged by reason of the conduct complained herein;

C.    Requiring restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law or equity for the Defendants' breaches of fiduciary duties; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June ____, 2011                    Respectfully submitted,


By: s/Amanda R. Cefalu_____


**ANDERSON, HELGEN, DAVIS & NISSEN, PA**
Henry M. Helgen, III  (#151075)
Amanda R. Cefalu (#309436)
150 South Fifth Street, Suite 3100
Minneapolis, MN 55402
Telephone: (612) 435-6363
Facsimile: (612) 435-6379
hmh@andersonhelgen.com
arc@andersonhelgen.com

CARNEY  WILLIAMS BATES BOZEMAN &
PULLIAM, PLLC

Randall K. Pulliam
11311 Arcade Dr., Suite 200
Little Rock, AR 72211
Phone:  (501) 312-8500
Fax:  (501) 312-8505

## VERIFICATION

I, Salvatore M. Talluto, under penalty of perjury, declare as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 6 / 6 / 2011

_Salvatore M. Talluto_
Salvatore M. Talluto